STATE OF HAWAII, Plaintiff-Appellee, *v.* NORMAN SANTIAGO, Defendant-Appellant

No. 4966

December 29, 1971

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY ABE, J.

This case presents a series of troublesome issues concerning the conduct of a criminal trial. In brief we are called upon to decide:

I. Whether in a criminal case the defendant's credibility as a witness may be impeached by showing that he had previously been convicted of first degree burglary.

II. Whether custodial admissions made by the defendant, who had not been properly apprised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), may be used to impeach the defendant when he takes the stand, even though the admissions could not be introduced as direct evidence in the prosecutor's case in chief.

III. Whether in a murder case the jury could properly be instructed to presume the existence of malice aforethought.

IV. Whether on the evidence introduced below, a self-defense instruction should have been given.

We resolve all issues in favor of the defendant and remand the case for a new trial.

*       *       *

The defendant was convicted of first degree murder and sentenced to life imprisonment without possibility of parole.

The conviction arose from an incident occurring in October of 1969 at the Queen's Hotel in Honolulu, where the defendant, Norman Santiago, and April Piko were living. On the night of the incident, the defendant and Miss Piko had quarreled and the defendant had gone out to a store. Meanwhile Miss Piko had phoned her mother to ask her to take her home. Miss Piko had, apparently, also summoned a policeman.

When the defendant returned from the store, he found Miss Piko preparing to leave and Officer Lindemann in the hallway of the hotel.

Apparently an argument developed between the defendant and Officer Lindemann concerning the officer's right to be there. A dispute developed at the doorway, Officer Lindemann trying to open the door, and the defendant trying to close the door. A brutal struggle ensued, although there was conflicting testimony concerning who struck the first blow. There was testimony that Officer Lindemann was hitting the defendant with a flashlight, and the defendant was striking the officer with the officer's blackjack. The defendant testified that the officer went for his gun, and that they struggled over the holster. Several shots were fired, striking the officer in several places. Other policemen who had been summoned to the hotel arrived. There was testimony that the defendant rose and pointed a gun at one of the newly arrived officers, but the latter fired two shots and felled the defendant.

Officer Lindemann died before arriving at the hospital.

The defendant was treated for his bullet wounds at the Queen's Hospital. He was questioned by the police first at the hospital and later at the police station.

## I.

The first issue to be discussed arises from the following series of questions propounded by the prosecutor, Mr. Yim:

Q  BY MR. YIM: Norman, were you convicted in the past of any felonies?
A  Yes.
Q  When was this?
A  When I was 20 years old but long time ago. It was for burglary.
Q  Burglary?
A  Yes.
Q  You remember what degree of burglary.
A  First degree burglary.
MR. YIM: I have no questions, your Honor.

It is the law in virtually every state that evidence of prior convictions may not be admitted in order to show that the

defendant has a criminal propensity and is likely to have committed the crime charged.[1] At the same time, however, if the accused takes the stand to testify in his own defense, prior convictions may be introduced in order to impeach his credibility as a witness.[2] Some states restrict the sorts of crimes which may be used to impeach credibility, holding that only felonies,[3] or infamous crimes,[4] or crimes involving moral turpitude[5] may be used. In a few jurisdictions, the trial judge determines in each case whether the probative value of evidence of prior crimes outweighs its prejudicial effects.[6] To ensure that prior convictions are considered only in weighing the defendant's credibility, and not in determining whether the defendant is guilty of the crime charged, judges give the jury a limiting instruction to that effect.[7]

---

[1]See Michelson v. United States, 335 U.S. 469, 475-76 (1948); People v. Molineux, 168 N.Y. 264, 291-93, 61 N.E. 286, 293-94 (1901); Swann v. United States, 195 F.2d 689, 690-91 (4th Cir. 1952).

[2]See, e.g., Ala. Code tit. 7, § 435 (1960); Ark. Stat. Ann. § 28-605 (1962); Conn. Gen. Stat. Rev. § 52-145 (1968); Fla. Stat. Ann. § 90.08 (1960); Idaho Code Ann. § 9-201 (1948); La. Rev. Stat. Ann. § 15:495 (1967); Md. Ann. Code art. 35, § 10 (Supp. 1969); Mass. Ann. Laws ch. 233, § 21 (1956); Mich. Stat. Ann. § 27A.2158 (1962); Minn. Stat. Ann. § 595.07 (Supp. 1971); Miss. Code Ann. § 1692 (1957); Mo. Ann. Stat. § 491.050 (1952); Mont. Rev. Codes Ann. § 94-4723 (1969); N.J. Rev. Stat. § 2A:81-12 (1952); N.Y. Civ. Prac. Law § 4513 (McKinney 1963); Okla. Stat. Ann. tit. 12, § 381 (1960); Ore. Rev. Stat. § 44.020 (1969); S.C. Code Ann. § 26-406 (1962); Utah Code Ann. § 78-24-1 (1953); Wash. Rev. Code Ann. § 5.60.040 (1963); Wis. Stat. Ann. § 885.19 (1966); Alaska R. Civ. P. 43(g)(11)(b).

[3]See, e.g., State v. Sorrell, 85 Ariz. 173, 333 P.2d 1081 (1959); State v. Stein, 60 Mont. 441, 199 P. 278 (1921).

[4]See, e.g., Drazen v. New Haven Taxicab Co., 95 Conn. 500, 111 A. 861 (1920); People v. Kirkpatrick, 413 Ill. 595, 110 N.E.2d 519 (1953).

[5]See, e.g., Ala Code tit. 7, § 434 (1960); Vt. Stat. Ann. tit. 12, § 1608 (Supp. 1971).

[6]Luck v. United States, 121 U.S. App. D.C. 151, 348 F.2d 763, 767-69 (1965); Gordon v. United States, 127 U.S. App. D.C. 343, 383 F.2d 936 (1967); People v. Montgomery, 47 Ill.2d 510, 268 N.E.2d 695, 697 (1971).

[7]People v. Smith, 63 Cal. 2d 779, 48 Cal. Rptr. 382, 409 P.2d 222, 230 (1966); Seventh Circuit Judicial Conference Comm. on Jury Instructions, *Manual on Jury Instructions in Federal Criminal Cases* § 6.06-2, in 33 F.R.D. 523, 576 (1964).

A number of authorities have come to believe that when the witness to be impeached is also the defendant in a criminal case, the introduction of prior convictions on the issue of whether the defendant's testimony is credible creates a substantial danger that the jury will conclude from the prior convictions that the defendant is likely to have committed the crime charged.[8] The danger of prejudice is scarcely mitigated by an instruction to consider the prior convictions only in determining whether or not the defendant's testimony is credible. To inform the jury in a rape case that the defendant has a prior rape conviction and then instruct them to consider the conviction only in evaluating the defendant's credibility is to recommend "a mental gymnastic which is beyond, not only their power, but anybody else."[9] As the United States Supreme Court stated in *Bruton v. United States*, 391 U.S. 123, 135, (1968), "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

Admission of prior convictions to impeach credibility puts the criminal defendant who has prior convictions in a tremendous dilemma. He knows that the jury will learn of his prior convictions only if he takes the stand to testify in his own defense. He knows that the jury may use his prior convictions in its determination of whether or not he is guilty. Any defendant who has prior convictions will therefore feel constrained not to take the stand.

---

[8]Griswold, "The Long View," 51 A.B.A.J. 1017, 1021 (1965); Richards v. United States, 192 F.2d 602, 605 (D.C. Cir. 1951); People v. Montgomery, 47 Ill. 2d 510, 268 N.E.2d 695 (1971); Fed. R. Evid. 6-09, Advisory Committee Note at 126 (Prelim. Draft 1969), reprinted in 46 F.R.D. 161, 298 (1969).

[9]L. Hand in Nash v. United States, 54 F.2d 1006, 1007 (2d Cir. 1932). *See* Krulewitch v. United States, 336 U.S. 440, 453 (1949) (concurring opinion); United States v. Jacangelo, 281 F.2d 574, 576 (3d Cir. 1960); United States v. Grunewald 233 F.2d 556, 574 (2d Cir. 1956) (dissenting opinion); People v. Montgomery, 47 Ill. 2d 510, 268 N.E.2d 695, 697 (1971); Comment, "Other Crimes Evidence at Trial: Of Balancing and Other Matters," 70 *Yale L.J.* 763, 777 (1961), n. 89 and accompanying text.

It has long been recognized that every criminal defendant has a right to testify in his own defense. That right is "basic in our system of jurisprudence" and implicitly guaranteed by the Due Process Clause of the Fourteenth Amendment. *In re Oliver*, 333 U.S. 257-273 (1948); *Hovey v. Elliott*, 167 U.S. 409, 417-19 (1897). While technically the defendant with prior convictions may still be free to testify, the admission of prior convictions to impeach credibility "is a penalty imposed by courts for exercising a constitutional privilege." *Griffin v. California*, 380 U.S. 609, 614 (1965). That penalty "cuts down on" the right to testify "by making its assertion costly." *Griffin*, 380 U.S. at 614 (holding that prosecutorial comment on a defendant's failure to take the stand is an unconstitutional burden on his right not to testify).

Despite the burden imposed on the defendant's right to testify, we might nevertheless sanction admission of prior crimes to impeach credibility if there were some value outweighing the burdens imposed. It is apparent, however, that prior convictions are of little real assistance to the jury in its determination of whether the defendant's testimony as a witness is credible. When the prior crime has nothing to do with dishonesty, there may be no logical connection whatsoever between the prior crime and the determination of whether the defendant may be believed. Even if the crime involves dishonesty or false statements, in light of the fact that every criminal defendant may be under great pressure to lie, the slight added relevance which even a perjury conviction may carry would not seem to justify its admission.[10] Furthermore, since the jury is presumably qualified to determine whether or not a witness is lying from his demeanor and his reaction to probing cross-examination,

---

[10]Comment, "Other Crimes Evidence at Trial: Of Balancing and Other Matters," 70 *Yale L.J.* 763, 778 (1961).

there would appear to be little need for evidence of prior convictions even if the crime involves false statements.[11]

Motivated by these considerations, in *Asato v. Furtado*, 52 Haw. 284, 474 P.2d 288 (1970), we held that evidence that a defendant had been convicted of heedless and careless driving could not be introduced to impeach his credibility as a witness in a civil action. We stated that HRS § 621-22 (1968), which seemed on its face to authorize use of all prior convictions to impeach credibility, must be read in light of the basic rules of evidence. We noted that evidence of a traffic offense was essentially irrelevant to the issue of whether the defendant was a credible witness. We indicated that if prior convictions could be used at all to impeach credibility, they could be used only if, like perjury and offenses "involving dishonesty or false statement," the prior crime "rationally carries probative value on the issue of the truth and veracity of the witness." 52 Haw. at 293, 474 P.2d at 295.

Today, in the context of a criminal case, we wish to go further. We believe that the concerns enumerated in the context of a civil case in *Asato* are even more compelling in a criminal case where the state seeks to impeach the credibility of the defendant as a witness. Whether the suit is civil or criminal, evidence of prior convictions is of only minimal relevance to a witness' credibility. In a criminal case there are added concerns because a defendant's knowledge that the jury may conclude from the prior convictions that he is guilty may compel him to forego his privilege to testify. Since there is no compelling reason to impose that burden, we hold that to convict a criminal defendant where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense. Insofar as HRS § 621-22 and any rule of

---

[11]Note, "Procedural Protections of the Criminal Defendant—A Reevaluation of the Privilege Against Self-Incrimination and the Rule Excluding Evidence of Propensity to Commit Crime," 78 *Harv. L. Rev.* 426, 440 (1964).

this court allow the introduction of prior convictions in a criminal case to prove the defendant's testimony is not credible, those provisions are at odds with the Due Process Clauses of Haw. Const. art. I, § 4 and the Fourteenth Amendment of the United States Constitution.

We do not today deal with the situation where the defendant has himself introduced testimony for the sole purpose of establishing his credibility as a witness. Whether in those circumstances, the prosecutor may introduce evidence of prior convictions is a question which is not before us. While we would hesitate to erect a trap under which an unwary defense lawyer's introduction of some trivial evidence concerning the accused's credibility may unleash a flood of damaging prior convictions, we need not reach those matters in this case.

Nor do we deal with the case where the prosecutor seeks to impeach the credibility of a witness who is not at the same time the defendant in a criminal case. Our holding reaches only the situation where there is a danger that the jury will use the prior conviction in determining whether a criminal defendant is guilty of the crime charged, such that the defendant's right to testify in his own defense is inhibited.

In light of the fact that this is a criminal case in which basic constitutional protections having a substantial effect on the defendant's rights are in issue, the prosecutor's argument that the admission of evidence of prior convictions was not plain error cannot be sustained.

We turn now to other issues which must inevitably arise again at retrial. *See United States v. Amerine*, 411 F.2d 1130 (6th Cir. 1969).

II.

The next issue to be discussed is whether the defendant was properly questioned at trial concerning statements made to the police at Queen's Hospital and at the police station.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court of the United States held that before the state can make use of admissions or confessions made by a defendant during custodial interrogation, it must first show that certain procedural safeguards were taken to protect the accused's privilege against self-incrimination. The Court held that, unless other effective protections were developed, the accused must be

"warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. * * * [U]ntil such warnings * * * are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 479.

The Court's basic aim in *Miranda* was to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." 384 U.S. at 469. The Court said:

"[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 U.S. at 467.

The *Miranda* opinion seemed clearly to hold that absent a showing that the required warnings were given, no reference could be made at trial to statements made by the accused during custodial interrogation. As the Court put it, "[T]he warnings required * * * are prerequisites to the ad-

missibility of any statement made by a defendant," 384 U.S. at 476, and in the absence of a showing that the accused was warned of his rights, "no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 479.

In *Harris v. New York*, 401 U.S. 222 (1971), the United States Supreme Court, in a five to four decision, held that statements inadmissible under *Miranda* could nevertheless be used to impeach the testimony of a defendant who took the stand. The majority opinion first distinguished the *Miranda* decision by stating:

"Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

\*      \*      \*      \*      \*

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." 401 U.S. at 224-26.

Justices Black, Brennan, Douglas and Marshall dissented. The dissenting opinion by Justice Brennan stated:

"\* \* \* [T]he Fifth Amendment's privilege against self-incrimination \* \* \* is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the *unfettered* exercise of his own will' \* \* \*. The choice of whether to testify in one's own defense must therefore be 'unfettered,' since that choice is an exercise

of the constitutional privilege, *Griffin v. California,* 380 U.S. 609 (1965). *Griffin* held that comment by the prosecution upon the accused's failure to take the stand or a court instruction that such silence is evidence of guilt is impermissible because it 'fetters' that choice—'[i]t cuts down on the privilege by making its assertion costly.' *Id.,* at 614. For precisely the same reason the constitutional guarantee forbids the prosecution from using a tainted statement to impeach the accused who takes the stand: The prosecution's use of the tainted statement 'cuts down on the privilege by making its assertion costly.' *Ibid.* Thus, the accused is denied an 'unfettered' choice when the decision whether to take the stand is burdened by the risk that an illegally obtained prior statement may be introduced to impeach his direct testimony denying complicity in the crime charged against him. * * *

"The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system. The 'essential mainstay' of that system, *Miranda v. Arizona,* 384 U.S., at 460, is the privilege against self-incrimination, which for that reason has occupied a central place in our jurisprudence since before the Nation's birth. Moreover, 'we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. . . . All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government . . . must accord to the dignity and integrity of its citizens.' *Ibid.* These values are plainly jeopardized if an exception against admission of tainted statements is made for those used for impeachment purposes. Moreover, it is monstrous that courts should aid or abet the law-breaking police officer. It is abiding truth that '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' *Mapp v. Ohio,* 367 U.S. 643, 659 (1961).

Thus, even to the extent that *Miranda* was aimed at deterring police practices· in disregard of the Constitution, I fear that today's holding will seriously undermine the achievement of that objective. The Court today tells the police that they may freely interrogate an accused incommunicado and without counsel and know that although any statement they obtain in violation of *Miranda* cannot be used on the State's direct case, it may be introduced if the defendant has the temerity to testify in his own defense. This goes far toward undoing much of the progress made in conforming police methods to the Constitution. I dissent." 401 U.S. at 229-232 (footnotes omitted).

The majority of the United States Supreme Court is, of course, the final arbiter of the meaning of the United States Constitution and its Amendments. We therefore bow to its interpretation of the privilege against self-incrimination in the Fifth Amendment of the United States Constitution.

However, this court is the final arbiter of the meaning of the provisions of the Hawaii Constitution. Nothing prevents our constitutional drafters from fashioning greater protections for criminal defendants than those given by the United States Constitution. *State v. Texeira,* 50 Haw. 138, 142, 433 P.2d 593, 597 (1967).

Article I, Section 8 of the Constitution of Hawaii (1968) states:

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy; nor shall any person be compelled in any criminal case to be a witness against himself."

This court has not previously had occasion to determine the scope of the protections guaranteed by Hawaii Constitution's privilege against self-incrimination. We hold today

that the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the Hawaii Constitution's privilege against self-incrimination. We hold that that provision requires that before reference is made at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned. Unless other equally effective protections are developed, the prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him. We hold that unless these protective measures are taken, statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination.

We base our decision on our belief that the privilege against self-incrimination bestows on every accused the right to choose whether or not to confess to the commission of a crime. In order to protect that freedom of choice, we believe that every accused, must be informed of the fact that he has certain rights under the Hawaii Constitution. In order to encourage the police to inform persons accused of crimes of their rights, and in order to preserve the integrity of the judicial process, we believe that where the accused is not informed of his rights, any admissions or confessions must be entirely excluded from his trial. Finally, we believe that if the rationale underlying *Miranda* is sufficient to warrant the exclusion of prior statements from the prosecutor's case in chief, then that same rationale precludes use of those statements for impeachment.

We, like the writers of the *Harris* majority opinion and the opinions following *Harris*,[12] are reluctant to allow a de-

[12]Riddell v. Rhay, 79 Wash.2d 248, 484 P.2d 907 (1971); Ameen v. State, 51 Wis.2d 175, 186 N.W.2d 206 (1971); Rooks v. State, .......... Ark........., 466 S.W.2d 478 (1971); Jorgenson v. People, .......... Colo. ........., 482 P.2d 962

fendant to take the stand and testify in contradiction to statements made during custodial interrogation. Society has a valid policy of convicting and punishing persons guilty of crime. Our system of government, however, maintains a countervailing value of protecting the accused's privilege to freely choose whether or not to incriminate himself. This value must be maintained, even though it necessitates that a certain number of criminals must go free in order to preserve the rights of all persons accused of crimes. To convict a person on the basis of statements procured in violation of his constitutional rights is intolerable. The prosecutor's argument that he had a right to impeach the defendant with statements made in the absence of *Miranda* warnings cannot, under the Hawaii Constitution, be sustained.

## III.

The next argument raised by the defendant is that the trial court improperly instructed the jury that:
"When the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor."
We dealt with an identical instruction in *State v. Cuevas*, 53 Haw. 110, 488 P.2d 322 (1971). We held that the instruction violated the accused's right to have every element of the offense proved beyond a reasonable doubt. We see no reason to abandon that holding today.

The troublesome point raised in this case is not whether under *Cuevas*, the instruction given was erroneous. The difficult question is whether *Cuevas*, decided in August of 1971, applies to this case, which was originally tried in 1970. In *Johnson v. New Jersey*, 384 U.S. 719 (1966), the United

---

(1971); State v. Iverson, 187 N.W.2d 1 (N.D. 1971); Utsler v. Erickson, 440 F.2d 140 (8th Cir. 1971); Perez v. State, 466 S.W.2d 283 (Ct. Crim. App. Tex. 1971).

States Supreme Court held that its decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), would not be applied retroactively. It went on to hold that the *Miranda* standards would not apply even in cases still in the appellate process coming before the court on direct review. A later case, *Jenkins v. Delaware*, 395 U.S. 213 (1969) held that the *Miranda* standards need not be applied to the retrial of a case originally tried before *Miranda* was decided. Were a similar approach followed here, we would be led to the conclusion that the defendant in this case would not receive the benefit of our *Cuevas* decision, even though he appeals to us on direct review.

We reject that conclusion. We hold that our decision in *Cuevas* is applicable to this case and to all cases not final at the time *Cuevas* was decided.[13] Whether *Cuevas* is fully retroactive and applicable to habeas corpus petitioners seeking relief from convictions already final when *Cuevas* was decided is a question we need not reach in the present appeal.

The United States Supreme Court's precedents on retroactivity form a curious lacework. The decisions begin with the premise that "the Constitution neither prohibits nor requires restrospective effect." *Linkletter v. Walker*, 381 U.S. 618, 629 (1965). *See also Tehan v. Shott*, 382 U.S. 406, 410 (1965). Free to apply decisions with or without retroactivity, the Court's task is to exercise its discretion, weighing the merits and demerits of retroactive application of the particular rule. *Linkletter v. Walker*, 381 U.S. at 629; *Tehan v. Shott*, 382 U.S. at 410; *Stovall v. Denno*, 388 U.S. 293, 296-97 (1967); *Jenkins v. Delaware*, 395 U.S. 213, 218 (1969); *Williams v. United States*, 401 U.S. 646, 652 (1971).

In making that determination, the court has given consideration to three factors: (a) the purpose to be served by the newly announced rule, (b) the extent of reliance by law

---

[13]By final we mean those cases in which the judgment of conviction has been rendered and possibility of appeal and certiorari exhausted.

enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. *Johnson v. New Jersey*, 384 U.S. 719, 727 (1966); *Stovall v. Denno*, 388 U.S. 293, 297 (1967); *DeStefano v. Woods*, 392 U.S. 631, 633 (1968); *Desist v. United States*, 394 U.S. 244, 249 (1969).

Primary consideration is given to the purpose for which the new standards are adopted. Rules designed to protect "the very integrity of the fact-finding process," *Linkletter, supra* at 639, such as rules requiring counsel at various stages in the trial and appellate process are given retroactive effect. *McConnell v. Rhay*, 393 U.S. 2 (1968); *see also Berger v. California*, 393 U.S. 314 (1969); *Roberts v. Russell*, 392 U.S. 293 (1968); *Arsenault v. Massachusetts*, 393 U.S. 5 (1968); *see* discussion in *Tehan v. Shott*, 382 U.S. 406, 416 (1966); *Johnson v. New Jersey*, 384 U.S. 719, 728-29 (1966); *Stovall v. Denno*, 388 U.S. 293, 298-99 (1967); *United States v. U.S. Coin & Currency*, 401 U.S. 715, 728-30 (1971, Brennan, concurring). On the other hand, retroactive effect is not given to decisions designed to deter official misconduct so as to protect other values, such as the privilege against self-incrimination, *Johnson v. New Jersey*, 384 U.S. 719 (1966); *Tehan v. Shott*, 382 U.S. 406, 415-16 (1966); or the freedom from unreasonable searches, *Desist v. United States*, 394 U.S. 244, 249-50 (1969); *Williams v. United States*, 401 U.S. 646, 653-54 (1971); *Mackey v. United States*, 401 U.S. 667 (1971); or the right to a jury trial, *DeStefano v. Woods*, 392 U.S. 631 (1968).

In the cases in which the Supreme Court has chosen not to apply a decision with full retroactivity, the Court has adopted a number of different dividing lines to separate those cases which will and those which will not benefit from the new ruling. The earlier decisions dealing with retroactivity applied "new" rulings to all cases still in the appellate

[14]Linkletter v. Walker, 381 U.S. 618 (1965); Tehan v. Shott, 382 U.S. 406 (1966).

process when the "new" rule was announced, but not to collateral proceedings brought by habeas corpus petitioners.[14]

In later cases the Supreme Court has attempted to limit the number of defendants who would benefit from the "new" ruling. *Johnson v. New Jersey*, 384 U.S. 719 (1966), applied the Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966) only to trials beginning after *Miranda* was decided and not to appeals of trials already begun, even if the decisions were appealed on direct review. *Fuller v. Alaska*, 393 U.S. 80 (1968), held that the Court's ruling in *Lee v. Florida*, 392 U.S. 378 (1968) (requiring the exclusion of evidence obtained in violation of § 605 of the Federal Communications Act) would be inapplicable in all cases in which the tainted evidence had already been introduced at trial at the time *Lee* was decided. Another group of cases has applied new rulings only in cases in which proscribed official conduct had not already occurred when the new ruling was announced.[15]

The Supreme Court in later cases seems to limit the application of the new constitutional standards to the least number of cases. Where the issue involves police or prosecutorial acts conducted in reliance on previous decisions, it is in one sense fair to apply the new ruling to misconduct occurring after its announcement.

The approach taken in the later cases creates one incongruity which has prompted vigorous criticism from Justices Harlan and Douglas. *Desist v. United States*, 394 U.S. 244, 258-59 (Harlan, dissenting), 255-56 (Douglas, dissenting); *Mackey v. United States*, 401 U.S. 667, 695-702 (Harlan,

---

[15]Stovall v. Denno, 388 U.S. 293 (1967), applied the right to counsel at lineups only to identifications occurring subsequent to United States v. Wade, 388 U.S. 218 (1967) and Gilbert v. California, 388 U.S. 263 (1967). DeStefano v. Woods, 392 U.S. 631 (1968), held the new standards regarding the right to a jury in serious criminal cases applicable only to trials beginning after Duncan v. Louisiana, 391 U.S. 145 (1968). Williams v. United States, 401 U.S. 646, 650-51 (1971), held that new standards for warrantless searches enunciated in Chimel v. California, 395 U.S. 752 (1969) would be applicable only to searches conducted after the date of the *Chimel* decision.

dissenting). The defendants in the one or two cases in which the Court announces its new ruling receive new trials, while all others appealing on direct review receive no relief. Two criminals might commit identical crimes on the same day. Identical errors might be committed when each is brought to trial. Each might appeal, briefing and arguing the same error. For purely adventitious reasons, the decision in one case might be reached previous to the decision in the other.

Little can be said to justify such anomalous treatment. Cases coming before the court on direct review do not present the problems posed by the application of a decision retroactively to habeas corpus petitioners. Appeals filed directly are generally from recent trials, so memories are not dim and evidence stale, as may be the case with habeas corpus petitioners. Further, the small number of new trials that would be necessitated by application of decisions like *Cuevas* to other cases arising on direct review is less likely to disrupt the appellate process in Hawaii than would the application of new rules to habeas corpus petitioners. We therefore apply our holding in *Cuevas* to this case, as we applied it to other cases coming before the court on direct review. *See State v. Irvin*, 53 Haw. 119, 488 P.2d 327 (1971), and *State v. Niskromoni*, 53 Haw. 122, 488 P.2d 329 (1971).

## IV.

The defendant finally argues that the trial judge erred in refusing to give an instruction on self-defense. In *State v. Irvin*, 53 Haw. 119, 120, 488 P.2d 327, 328 (1971), in an identical situation, we stated what has long been the law on this issue:

[T]he court refused to give defendant's requested instructions on self defense on the ground that defendant had the gun and any instruction on self defense was not justified by the facts. Defendant's theory at the trial was that the killing was accidental, not that it was done in self defense. But his testimony fairly raised the issue of self defense. That being the case, he was entitled to an in-

struction on that issue no matter how weak, unsatisfactory, or inconclusive the testimony might have appeared to the court. *Territory v. Alcantara,* 24 Haw. 197, 208 (1918); *State v. Chang,* 46 Haw. 22, 47, 374 P.2d 5, 18 (1962). The fact that the issue raised by the testimony was not consonant with the theory of defense makes no difference. *Womack v. United States,* 336 F.2d 959 (1964). Thus, the court's refusal of self-defense instruction was reversible error."

Construing the defendant's testimony in the most favorable light possible, there was evidence on which the jury might have concluded that the defendant acted in self-defense. If at retrial the evidence fairly raises an issue of self-defense, the defendant will be entitled to have the matter submitted to the jury.

Reversed and remanded.

*James Blanchfield,* Deputy Public Defender (*Brook Hart,* Public Defender, with him on the briefs), for defendant-appellant.

*Douglas L. Halsted,* Deputy Prosecuting Attorney (*Barry Chung,* Prosecuting Attorney, and *Patricia K. Park,* Deputy Prosecuting Attorney, with him on the brief), for plaintiff-appellee.